COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, O'Brien and Retired Judge Coleman[*]

VICTORIA J. SALVATO

v.     Record No. 0399-15-4

FRANK SALVATO

MEMORANDUM OPINION[**]
PER CURIAM
SEPTEMBER 15, 2015

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
J. Howe Brown, Judge Designate

(David M. Zangrilli, Jr.; Odin, Feldman & Pittleman, PC, on brief),
for appellant.

(Alex Levay; Frank Salvato, on brief), for appellee.

Victoria J. Salvato (mother) appeals a visitation order. Mother argues that the trial court

erred when it (1) held that mother shall have no contact with her husband, Brian Busick, while

exercising custodial care of her son; (2) ruled that mother shall not speak to Busick while her son is

in her custodial care; (3) held that mother shall not leave her son "under any circumstances except in

the case of emergency;" and (4) allowed an expert witness, Dr. Stacey Hoffman, to testify on direct

examination about hearsay statements made by her minor son. Upon reviewing the record and

briefs of the parties, we conclude that this appeal is without merit. Accordingly, we summarily

affirm the decision of the trial court. See Rule 5A:27.

---

[*] Retired Judge Coleman took part in the consideration of this case by designation pursuant to Code § 17.1-400(D).

[**] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

Mother and Frank Salvato (father) have two minor children. The parties married on June 11, 1994 and divorced on May 1, 2009. The divorce decree incorporated the parties' property settlement agreement, in which the parties agreed to joint legal and physical custody of the children and an alternating week visitation schedule.

Subsequently, both parties filed motions to modify custody and visitation. On July 30, 2012, the trial court entered an order that modified the visitation schedule. The trial court was concerned about the children's safety around Busick because he was an alcoholic and mother did not recognize the danger. The July 30, 2012 order stated, "The children are to have no contact with Brian Busick. This is the order of the Court and applies whether or not the Mother is engaged, married or whatever her relationship is with Brian Busick."

On February 7, 2014, mother filed a motion to modify custody and visitation. In her motion, she indicates that she and Busick were engaged to be married, and planned to do so on May 24, 2014. She requested that the trial court remove the prohibition against the children having any contact with Busick.

On February 28, 2014, father filed a response to mother's motion, as well as his own motion to modify custody and visitation. Father requested that the no contact order remain in effect. He also asked the court to award him sole legal and physical custody and that mother "be awarded visitation with the children on a schedule that ensures the children are safe and protected and serves the best interest of the children."

At mother's request, the trial court ordered that Dr. Hoffman, a clinical psychologist, provide therapy to the parties' children. The September 29, 2014 order stated that "Dr. Hoffman is authorized to address what treatment is in the best interests of [the parties' daughter] and may make recommendations regarding [their son's] best interests."

The trial court heard evidence and argument on February 9 and 10, 2015. At the beginning of the trial, mother informed the court that she agreed to father having primary physical custody of their daughter, and she would have visitation with their daughter in accordance with Dr. Hoffman's recommendations.

Then, mother presented evidence from Dr. Edward Farber, a clinical psychologist, who performed a psychological evaluation of Busick. He stated that Busick did not have any thought disorders and had improved in his commitment to sobriety. However, Dr. Farber also confirmed that Busick drank alcohol, to the point of intoxication, in 2013 and 2014.

Craig James, an expert in the field of clinical social work, also testified. James works with clients who have substance abuse issues. James had been providing individual psychotherapy to Busick approximately once per week for one year. James testified that Busick was in the "maintenance stage," which means the person is stable, in recovery, and not in active use. However, James also was aware of Busick drinking in 2014.

Busick testified that he had a "wonderful" relationship with mother's children prior to the July 30, 2012 court order. In addition, he testified about his alcohol use. In October 2012, he was stopped for drinking and driving, and driving on a restricted license. In 2013, he was convicted of violating the conditions of his ASAP agreement. Busick admitted to consuming alcohol in 2013 and 2014.

On cross-examination, Busick indicated that there were times when mother's children waited in the car while mother went in Busick's house "for errands and things of that nature." Busick also stated that mother gave up her custodial time with the children in order to go with him on a week-long beach trip in 2013 and 2014, as well as for her wedding and honeymoon.

Mother testified. She stated that she did not think her relationship with Busick affected how she parented her children. She acknowledged that Busick was an alcoholic, but she said that

she has seen improvements in his behavior. For example, she said that Busick was "actually taking responsibility for the actions that he's caused or the reactions to his drinking that have happened." Mother testified that she felt father was alienating her from the children.

Mother also explained that there were occasions when she would have custody of the children, but have to go to Busick's house "to get something." She admitted that the children sat in the car, while she went in the house. She also acknowledged that the children stayed at home while she ran errands with Busick.

Father testified about the children's excellent behavior while they are with him. He also testified about mother's anger about the no contact order and their failed attempts at counseling and co-parenting.

Dr. Hoffman testified that she started seeing the children in October 2014. She recommended that the parties' daughter continue living with father and only have contact with mother in the presence of a therapist. She recommended that the parties' son continue living with father and have contact with mother every other weekend, but not overnight. She also recommended a dinner visitation during the week, "so there's not two weeks without contact." She was concerned about the declining mental health of the parties' son, and she said that he felt "much safer and calmer when he's in the presence of his father." Dr. Hoffman believed that the focus needs to be on improving the relationship between mother and the children and that the no contact order for Busick should continue.

At the conclusion of the evidence and argument, the trial court issued its ruling. It held that the parties would continue to have joint legal custody. Pursuant to the parties' agreement, father would have primary physical custody of their daughter, and mother would have visitation during therapy sessions and as Dr. Hoffman recommended. The trial court continued the no contact order between Busick and the children. The trial court further ruled that mother's

visitation with the parties' son would continue as it currently was, with the following additional restrictions:

> [Mother] is to have no contact with Brian Busick while she is exercising physical custody of [her son]. She is not to leave [her son] except in an emergency. She is to be with him 24/7 when he is visiting with her for now. And no contact, telephone or otherwise, when she has [her son] visit.

The trial court further ruled that the children should remain in therapy with Dr. Hoffman. As instructed by the trial court, the parties prepared a handwritten order reflecting the court's rulings, and the trial court entered the order on February 10, 2015.

On February 25, 2015, mother filed a motion to reconsider. On February 27, 2015, the trial court entered an order denying mother's motion to reconsider. This appeal followed.

ANALYSIS

*Visitation issues – Assignments of error 1 and 2*

"In matters of custody, visitation, and related child care issues, the court's paramount concern is always the best interests of the child." Farley v. Farley, 9 Va. App. 326, 327-28, 387 S.E.2d 794, 795 (1990).

"A trial court's determination with regard to visitation is reversible only upon a showing that the court abused its discretion." Stadter v. Siperko, 52 Va. App. 81, 88, 661 S.E.2d 494, 497 (2008) (citing M.E.D. v. J.P.M., 3 Va. App. 391, 398, 350 S.E.2d 215, 221 (1986)).

"The court, in the exercise of its sound discretion, may alter or change custody or the terms of visitation when subsequent events render such action appropriate for the child's welfare." Eichelberger v. Eichelberger, 2 Va. App. 409, 412, 345 S.E.2d 10, 12 (1986) (citing Allen v. Allen, 188 Va. 717, 721-22, 51 S.E.2d 207, 209-10 (1949); Code § 20-107.2).

Mother argues that the trial court imposed certain restrictions on visitation that are "unconstitutional" and "an impermissible injunction." Mother contends the trial court erred

- 5 -

when it ruled that during her visitations with her son, she should not have any contact with her husband, nor speak with her husband.

Mother contends the injunction preventing her from having any contact with her husband while she is visiting with her son violates her First Amendment right to free speech[1] and her rights pursuant to the Fourteenth Amendment. She asserts that her son would not be harmed if she spoke with her husband by telephone or sent him a text message.

Mother cites D'Ambrosio v. D'Ambrosio, 45 Va. App. 323, 610 S.E.2d 876 (2005), to support her arguments that the trial court's injunction is impermissible. In D'Ambrosio, the Court held that the trial court abused its discretion when it enjoined the father from making "defamatory comments" about the mother to any "third parties." Id. at 344, 610 S.E.2d at 886. The Court held that there was no evidence that without the injunction, the mother would be irreparably harmed. Id. at 342, 610 S.E.2d at 885. Second, the Court held that the mother had an adequate remedy at law because she could bring a common law action for defamation if father made defamatory comments about her to others. Id. Third, the Court held that the injunction was "vague and overbroad." Id. at 343, 610 S.E.2d at 886.

Likewise, mother claims that there was no evidence that their son would be irreparably harmed if she contacted Busick. Second, she contends there were other remedies at law, including the existing no contact order between her son and Busick. Thirdly, she argues that the injunction was overbroad because it prevented her from contacting her husband even while her son was asleep or at school.

---

[1] Mother raises arguments for the first time on appeal regarding the strict scrutiny test for violations of First Amendment rights. She did not raise these arguments below, so this Court will not consider them. See Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998) (We "will not consider an argument on appeal which was not presented to the trial court.").

The trial court heard evidence about how the visitations between mother and her son were progressing since the last court order. There was evidence that mother would leave him alone, or with his sister, while mother ran errands with Busick. Mother also would leave him alone in the car while she went inside Busick's home. At the time of the 2012 order, her son was eight years old. At the time of 2014 hearing, her son was ten years old. Dr. Hoffman testified about her concern for the boy's "declining" mental health. Dr. Hoffman explained that mother's son does not feel "safe and calm" when he is with his mother. She stated that the son was upset about mother's marriage to Busick and it was the son's perception "that his mom chose Mr. Busick, and his children, as opposed to focusing on him."

When issuing its order, the trial court focused on the child's safety and what was in his best interests. It wanted mother to "put [the child] number one, and have [the child] know he's number one . . . ." The trial court explained that the visitation restrictions would send a message to the child that "mom considers him to be the most important thing in her life, as he should be, and it will make him safe because he's always with mom." The trial court held that the current visitation schedule, with the additional restrictions, was in the best interests of the parties' son.

Therefore, in spite of mother's arguments to the contrary, the record supports the trial court's finding that her son would be irreparably harmed if mother contacted her husband during her visitations with her son. There were no other adequate remedies at law, other than the visitation restrictions, if mother wished to keep the same visitation schedule. Lastly, the restrictions that mother could not contact her husband were not vague or overbroad. Mother asked the trial court for clarification about the restrictions while the child was in school and whether she could contact her husband. The trial court stated that it was not going to change the language because then there would be "wiggle room" and "all kinds of problems." The trial

- 7 -

court noted that therapy was going to continue, and "we're working on getting things back together."

Contrary to mother's arguments, the trial court realized that mother may not be able to go three or four days without contacting her husband, so it stated that she could have less visitation with her son, if necessary. It also ruled, "The mother's no contact with her present husband during visitation is an essential element of the visitation awarded in the order."

Based on the record, the trial court did not abuse its discretion in imposing additional visitation restrictions on mother when she is visiting with her son, as they were implemented in the best interests of the child.

*Rule 5A:18 – Assignment of error 3*

For the first time on appeal, mother argues that the trial court erred when it ruled that she could not leave her son unattended under any circumstances, except in the case of an emergency.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." Rule 5A:18.

We "will not consider an argument on appeal which was not presented to the trial court." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998). "The purpose of Rule 5A:18 is to allow the trial court to correct in the trial court any error that is called to its attention." Lee v. Lee, 12 Va. App. 512, 514, 404 S.E.2d 736, 737 (1991) (en banc).

Mother asks the Court to apply the ends of justice exception. "'The ends of justice exception is narrow and is to be used sparingly . . . .'" Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) (quoting Brown v. Commonwealth, 8 Va. App. 126, 132, 380 S.E.2d 8, 10 (1989)). "In order to avail oneself of the exception, a defendant must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have

occurred." Id. (emphasis in original) (citing Mounce v. Commonwealth, 4 Va. App. 433, 436, 357 S.E.2d 742, 744 (1987)). Mother has not shown that a miscarriage of justice occurred, so the ends of justice exception does not apply. Therefore, the Court will not consider mother's third assignment of error.

*Expert witness – Assignment of error 4*

Mother argues that the trial court erred when it allowed Dr. Hoffman to testify on direct examination about statements made by the son.

During father's direct examination of Dr. Hoffman, counsel asked her about the child's view on a matter. Dr. Hoffman started to testify about what the child said. The following exchange then occurred between mother's counsel and the trial court:

> [COUNSEL]: Objection, Judge, again to what the child said.
>
> THE COURT: If you go to an orthopedist and he describe[s] a broken arm, if you go to a clinical psychologist, she describes what the kids say. So I'll overrule the objection.
>
> [COUNSEL]: I disagree with that. In direct examination an expert witness is allowed to provide opinions. They are allowed to give facts in support of their opinions. They are allowed to rely on hearsay. Hearsy [sic] is normally relied upon as an expert, but they are not in direct examination allowed to testify about the hearsay. I can ask her about that in cross, but not direct.
>
> THE COURT: I'll overrule your objection.

During mother's cross-examination of Dr. Hoffman, counsel asked her about the children's statements. Counsel specifically asked Dr. Hoffman to testify about what the children said.

On appeal, mother argues that Code § 8.01-401.1 and Rules 2.702 and 2.703 did not allow an expert witness to testify to hearsay statements on direct examination. Therefore, she contends the trial court erred in allowing Dr. Hoffman to testify to the children's statements.

- 9 -

Code § 8.01-401.1 provides:

> In any civil action any expert witness may give testimony and render an opinion or draw inferences from facts, circumstances or data made known to or perceived by such witness at or before the hearing or trial during which he is called upon to testify. The facts, circumstances or data relied upon by such witness in forming an opinion or drawing inferences, if of a type normally relied upon by others in the particular field of expertise in forming opinions and drawing inferences, need not be admissible in evidence.

Rule 2.703 mirrors the language in Code § 8.01-401.1. Rule 2.702(b) states: "Expert testimony may include opinions of the witness established with a reasonable degree of probability, or it may address empirical data from which such probability may be established in the mind of the finder of fact."

In McMunn v. Tatum, 237 Va. 558, 566, 379 S.E.2d 908, 912 (1989), the Supreme Court of Virginia stated:

> We now hold that Code § 8.01-401.1 does not authorize the admission in evidence, upon the direct examination of an expert witness, of hearsay matters of opinion upon which the expert relied in reaching his own opinion, notwithstanding the fact that the opinion of the expert witness is itself admitted, and notwithstanding the fact that the hearsay is of a type normally relied upon by others in the witness' particular field of expertise.

In M.E.D., 3 Va. App. at 401, 350 S.E.2d at 222 (quoting Code § 8.01-401.1), the Court indicated that a psychologist could rely on a child's statements in order to form her opinion because the statements were "'of a type normally relied upon by others in the particular field of expertise.'" The Court concluded that Code § 8.01-401.1 "clearly allows the expert to express an opinion or draw inferences from inadmissible sources, such as hearsay." Id. at 400-01, 350 S.E.2d at 221-22 (citations omitted).

In this case, Dr. Hoffman relied on the children's statements to form her opinions regarding visitation. Mother requested that Dr. Hoffman provide therapy to the children and the family. The September 29, 2014 order states that Dr. Hoffman "is authorized to address what

- 10 -

treatment is in the best interests of [the parties' daughter] and may make recommendations regarding [the parties' son's] best interests." The parties anticipated her speaking with the children and making recommendations to the trial court.

Based on the facts in this case, the trial court did not err in allowing Dr. Hoffman to testify to the child's statements on direct examination.

*Attorney's fees and costs*

Both parties have requested an award of attorney's fees and costs incurred on appeal. See O'Loughlin v. O'Loughlin, 23 Va. App. 690, 695, 479 S.E.2d 98, 100 (1996). On consideration of the record before us, we decline to award either party attorney's fees and costs on appeal.

CONCLUSION

For the foregoing reasons, the trial court's ruling is summarily affirmed. Rule 5A:27.

Affirmed.